The Federal Circuit is most pleased to be hearing arguments in our global array of cases here in San Francisco. We express our appreciation to the fine hospitality by Chief Judge Warren Walker and all of his colleagues and their staff who have made our visit here very comfortable, and we appreciate that. There is another Federal Circuit panel hearing arguments simultaneously in another courtroom on this floor, so this is part of our regular foray outside of Washington once or twice a year. We go to a distant location. Yesterday, we had two panels sitting simultaneously in the courthouse in San Jose. Today, we have four or two panels sitting effectively in Sanford Law School and Santa Clara Law School. That mix of courthouses and law schools is typical of our program here in San Jose. Two of the cases on today's list of arguments were taken off and became submitted cases. Those are Appeal 7191 from 2005, San Antonio v. Department of Veterans Affairs, and Hulse v. the VA. That's Appeal 3212 from the current year. There are also two appeals being submitted in pro se cases on the briefs today, namely Webb v. NASA, Appeal 1226 from the current year, and Laverne v. American System Protection Board, Appeal 3257 from the current year. Those are all arguments submitted solely in two cases, with those arguments first in Appeals 1142 and 2008, presented by Tim Hinckley of the United States Counsel. The panel decided that we would like to hear first for five minutes from Ms. Davies so that we can clarify a few matters. Following that, we will resume regular order with Mr. Finnell having 15 minutes, but we're adding five minutes here over time. We still have the five minutes for rebuttal. Then Ms. Davies will proceed again for 15 minutes and then a rebuttal. So we'll call the meeting to begin questioning with you, Ms. Davies. Welcome. Good morning. Good morning. What we'd like to try to clarify is whether it's the view of the government that there were documents specifically requested from Tim Hinckley which would not provide extant documents, company documents, from back at the time frame in question, and that that is the basis of the determination that the record is inadequate and therefore the adverse influences could be drawn from the statute as distinct from whether there was a lack of an explanation or there was something deficient in the documents that were produced. In other words, is this a case where critical documents that were specifically requested were not produced? May it please the Court. In this case, Commerce issued a very broad questionnaire asking for a lot of information. Yen Tai provided responses. There were actually six questionnaires, six sets of responses. At the verification, the Commerce economists and accountants and analysts found that some information on the financial statements had not been reported at all in response to the questionnaires. There were expenses on the certified financial statements that had not been reported at all. There was some indication in the record that ledgers and subledgers had been specifically requested and reviewed as needed but were never supplied. Well, the respondent bears the burden of demonstrating that it has certain expenses in the United States and it wants to spread those expenses to keep its U.S. price high and therefore its dumping margin low. So if the respondent wants to have a small amount allocated to the particular product for the expenses for that product, it needs to demonstrate its entitlement. So in that sense, Commerce was saying, if you want to demonstrate your entitlement to just a small sheet of expenses for this product as opposed to the total expenses you have on your balance sheet, you need to provide all the ledgers, all of the receipts, showing, rebates, commissions. You need to document the amount you're trying to allocate for this cost. Were those documents identified in the verification report? Well, they were not provided before verification or at verification. So I am trying to be responsive. Could you be more specific? Were you referring, for example, to the ratios that were used to allocate expenses? Well, for example, with respect to the rebates and commissions, all that Yantai provided before verification was an agreement that provided for rebates and expenses but did not show the extent to which those rebates or commissions had actually been paid or distinguished between aftermarket and the so-called OEM rebates and commissions. So that was all Commerce had before verification. After verification, Yantai wanted to submit information that it thought would show this breakdown between the two types and exactly how much was paid. But you said all Commerce had before verification were the agreements. What did they get at verification? Because certainly a lot of information was provided then. I'm not wanting to hear about what they tried to, in your mind, supplement the record with, but what were they deficient in bringing to the verification? They didn't have documents showing how the amount on the financial statements for total rebates and commissions should be allocated in a way they wanted to this particular product. Is the problem that they provided you with all the financial documentation but as we see a lot of times in sticky cases, it's sort of a dump of a million documents and there's no road map to connect the dots in the little connect-the-dots question? Or is it the case that simply there were not documents in the giant pile that could even arguably have provided you with that information? Well, I think it's a little bit of both but more the latter than the former. With respect to the rebates and commissions, for example, Yantai provided, before verification, provided a hypothetical, but the hypothetical wasn't consistent with the actual documents provided at verification, and there were no actual records at verification of actual rebates and commissions paid for these products, these particular products. Ms. Davidson, I want to come back to the question that the Chief Justice posed at the beginning and reframe it so I can get a crisp answer. Before verification, were there any documents that Commerce requested or demanded from Timken that Timken did not supply? That in the view of Commerce was necessary in order for Commerce to conduct its investigation, was there any failure of delivery of requested, required, necessary documents? Well, the instructions provided to Yantai before verification specified that Yantai was to produce all ledgers, all records, all documentation to support its claims for adjustments. So in that respect, Commerce did ask for the specific documents. I think that's what we were trying to focus on initially, and so can you be more specific about, so you can understand where we're coming from. The way in which the case is briefed and set up has to do with whether or not there's some additional information that Timken and Yantai Timken would like to have had Commerce consider, which Commerce expunged because they felt that it didn't satisfy the test of being new in material. It was new in material, so they threw it out. What we're looking to see is if there's an alternative ground on which to affirm here, namely that there was simply a failure by Timken at the front door to supply Commerce with what he asked for in order to be able to have a meaningful verification process. Right. Well, the questionnaires are very detailed, very specific, and before verification, the letter instructing Yantai what to bring to verification was very specific. Now, without seeing the documents, Commerce couldn't say, we need the receipt dated October 6, 1972, between you and Toyota, because it didn't know what documents existed. So it's crystal clear from the law of this Court that a party seeking a deduction or an adjustment in the anti-dumping duty margin bears the burden of demonstrating entitlement. So Yantai bore the burden of demonstrating it, and until it provided the documents and the information, Commerce couldn't ask for anything more specific than to say, all documents, all ledgers, all financial statements, all receipts. But did they supply all ledgers? They didn't supply any documentation that would support their claim that only some of their indirect selling expenses should be allocated to this product. Were there relevant ledgers among what was not supplied? Were there relevant ledgers that were not supplied? Yes. Well, after the verification, Yantai asked to submit new information, and it called it new information. I don't believe those were additional ledgers, but it sought to provide new information after the original information that it provided did not pass verification. It didn't pass verification on a number of other issues as well, in addition to the ones that it is raising here. But Commerce did consider all of the information that Yantai sought to provide after Yantai failed verification. And in some, with respect to some issues, Commerce said, all right, you're just pointing out to us something we missed at verification, and we will fix that. But where Yantai said, we want to submit new information, Commerce said, we can't take a dump of new information after verification, especially from a company that failed verification on the information it did provide. So, we're getting a little off track. Okay. With regard to aftermarket versus OEMs, was there a failure? What information was missing that you would have needed that they later then tried to put in to show that there are no rebates for the OEMs as opposed to the aftermarket? Because they gave you the contracts, and the face of the contract said that these only apply to aftermarket. They don't apply to OEMs, basically. I mean, I'm not being exact, but you can tell that from the agreements. But that doesn't mean there aren't other agreements that maybe did apply to OEMs that could have included rebates. And I understood that to be part of your argument. But my question is, is there something that they tried to introduce later that they should have introduced sooner that showed that there was nothing? How do you prove a negative almost, I guess, is what I'm asking you. If there are no agreements with regard to rebates for OEMs, what is it they should have brought? Should they have brought certain ledgers that show all the details of all of their OEM sales, so that you could then look at those and ascertain that, in fact, none of them seem to include rebates? Should they have bought every single receipt for an OEM? What is it they should have brought that they didn't, but then they tried to slip in later or may have tried to put in later? That's the heart of what I want to know. Well, the financial statements were very unclear about rebates and commissions, and Commerce did not interpret the agreement to be quite as clear as you apparently do in being limited to only one type of sale. But even after verification, the new information, I mean, Yantai is not faulting Commerce for not accepting new information on rebates and commissions. It just is arguing that it submitted enough. It never came forward with additional information on rebates and commissions. Well, I think having pursued this for 10 minutes, we should resume the normal order with Mr. Cannella. But if I could just finish just the response to that question. There was never any information provided before or after verification that showed actual rebates and commissions. There was only the agreement for either type. Thank you. Mr. Cannella, you have 15 minutes. Those five minutes will go by. Thank you, Your Honor. Would you mind if, not too much to derail you, you would start with the issue that I brought up? I guess I look at this, and I appreciate that Commerce said let's focus on these 10 sales, and every one of them was an aftermarket sale. And you brought what you thought would satisfy. It turns out it doesn't. And they focused on three, and you didn't have what you needed to substantiate. And I almost understand your briefing to say, okay, if you're going to apply the partial adverse findings, apply it to all of our aftermarket sales. But what in the world, where are you coming down with applying it to the originals? That's generally what you're doing, right? So I guess my question is, what did you provide to verify that it wasn't, that there were no rebates applicable to original equipment sales? What the issue came up in the context of the particular sales, which were AM sales, as you pointed out. The 10 different products? Right. No, but Commerce asked you to come prepared to verify everything in your questionnaire, which included an assertion by Timken that original equipment sales were not subject to rebates. Well, I think it would be dilatory for Commerce to simply take you at your word, not you personally, but you can understand the need for them to have proof because some companies might make such an assertion, but then it turns out there are all kinds of rebates going on. So you can see the need from their perspective for some sort of proof. So what is it that you offered to them to substantiate that? Did you bring receipts from the original equipment manufacturer sales showing how everything broke down? What was it that you brought? What we brought was, well, we had a session on our sales process, which is documented in Commerce's verification report. And in that, we reviewed how sales are made to the two kinds of different customers, how the contracts are negotiated, and what kind of the different business activities associated with them. And those, as we've asserted in our brief, those activities make it clear, for example, if you're selling, if your contract calls for just-in-time delivery, you're not going to give that customer a rebate for buying more stuff and stocking. Sure you might because you might want that customer to buy and keep a backlog. It seems unlikely that they're going to keep a stock of the original equipment. The aftermarket seems much more likely. I might only buy one toilet paper holder for my bathroom but have 20 pieces of rolls of toilet paper, and I'm unlikely to have a backlog of the holders. It's not likely I'll need those as often. But nonetheless, there might be some reason from your perspective to want to incentivize people to do that. So I understand that your argument to be one of policy, well, it doesn't make sense that people would back stock these. But that's not proof. That's just rationale. It wouldn't make sense except that the terms of the negotiations called for that. The business practice is to move the cost of inventory back to the supplier. And so it wouldn't make sense to negotiate for a buyer, an OEM, to negotiate with Timpkin to deliver only the amount they need and then turn around. You're saying it wouldn't make sense, but that doesn't mean it isn't done. Lots of people make business decisions that don't make sense. What proof did you offer that in the actual sales you made, it wasn't done, there weren't rebates given? Well, the nature of the rebates is that they were, as they were documented for the AM customers, is that they're paid for a certain amount of sales made each year. If you buy X percent, you get this much of a rebate and so on. So they don't show up in, that information doesn't show up on the individual transactions. For the AM sales, we provided individual sales information and checks showing the rebates that were paid. We provided individual documentation. The problem that arose was that we could not provide a sub-ledger. We were asked to, and we could not provide a sub-ledger on an individual customer basis, either for OEM or aftermarket, that showed this customer did or did not get a rebate. Isn't that fatal to your case? Sorry? Isn't that then going to be fatal to your case if you can't produce this particular report? If you wanted to substantiate, for example, that no rebates or commissions were ever paid to OEMs and therefore they should be excluded, bring in all of your OEM records and throw them on the table and point and say, see, no commissions, no rebates. Well, I know that's a tedious and burdensome prospect, but it shouldn't have been so big, I would think. No, it's our obligation. There's no question that we have an obligation. But we were asked only to provide documentation for these particular sales and to show what adjustments were made for them, and they were aftermarket sales. We then, when we found out that because we couldn't provide these specific sub-ledgers to prove the negative, that they hadn't been paid any more rebates, we then argued that, following that, that there is information on the record, which we've pointed out in our briefs, that demonstrates that discredits, in the terms used by this court in F. Lee v. Checco, that it is not appropriate to take information found out about one set of sales and apply it elsewhere. May I shift gears, please, to what I call the ISE issue? Yes, sir. I'm looking at JA2733 in the record where we have the final redactions that were required by Commerce to your final letter, right? And I'll keep talking because when you find it, it's JA2733. 2733? 2733 in the confidential joint appendix. Yes, Your Honor. Now, my understanding is that what you want us to do is to vacate the decision of Commerce and send the case back and tell Commerce that they have to include the items that are shown on 2733 and then reassess whether or not your asserted ISE number is correct in the light of these additional matters, right? That's correct. Right. Okay. Who gets to decide, in the order of things here, whether these items constitute new material or whether they constitute explanation of old material? The court does, Your Honor. Who gets to decide? Is that within the discretion of Commerce to decide whether they think something that might be viewed as explanation has morphed into new material? Well, certainly they are the fact finder, and that is their job. But their fact finding is not, you know, their ability to make these decisions are not unlimited. They have a practice of accepting explanations, and we've provided in our attachment to our Well, the cases in which you do that aren't square with this. They don't deal with exactly the same regulation. Sorry? It's true that over the course of time, Commerce has allowed material to be supplied to it on the grounds that it constituted an explanation, but I didn't understand from the case law you cited that that was pertinent to the exact regulation you're talking about here. The government complains that the cases you cite for the pattern of conduct are not on all fours with the facts of this case. Well, it's sometimes hard to identify on all fours when it's an accepted and customary practice. We put in our reply brief examples of the kind of information that we were talking about. We showed where in one explanation Commerce was accepting the fact that somebody pointed to a figure here as proving a figure here, and that's the kind of explanation that is included in Attachment 1. It seemed to me, and maybe I'm wrong, tell me if my characterization is wrong, it seemed to me that what you were this material that you're trying to get Commerce to be forced to require is sort of like the key to a map. My understanding of the theory of your case would be we gave all sorts of documents and numbers to Commerce, and if Commerce only knew how to read them, knew in which order to read them, knew which document to look to for which particular fact, then Hosanna, they would be able to see that the ISE number we asked for was correct. It's sort of like a roadmap or connect the dots. That's correct, Your Honor. So my question is why should an importer be able to go to verification with the key to the puzzle, if you will, in his pocket, not give it to Commerce, let Commerce wallow around in verification trying to figure out if your number is accurate, and then you come in afterwards and say, oh, my goodness, didn't you understand that you should have used this key to open the lock? Isn't that essentially what happened here? No, I would say that I would characterize it differently. You're not arguing that you should win the case unless we put these items back in the record. So these have to be the key that unlocks the lock. They are the key. But the issue is what happened was we went to verification. We provided hundreds of pages of documents. We spent a lot of time during verification explaining how the key, in our view. But none of these items on page this were, this is all material that was not presented to the verifier. No, I disagree, Your Honor. It was presented. Can you show me in the record where any of the items listed on J2733 were in the hands of Commerce before your post-verification brief was sent in? It was presented orally during verification. There's no transcript. That's part of the problem. That's not going to get you anywhere, is it? Well, that's why Commerce has the practice of allowing people to come in and explain because there can be, under the best of circumstances. But isn't Commerce refuting that by saying, oh, no, no, this is new, we didn't know that? Did you take the testimony of the Commerce officials that conducted the verification to ask them explicitly whether each of these points had orally been made at verification and get a yes or no answer to those questions? No, we did not. We did assert in all of our briefs, and it has never been contradicted by Commerce, that we thought we had explained these, the map, during verification. Well, I understand, but if there's no record has been made that these items are indeed only explanatory because they had already all been orally conveyed to a verifier who just flubbed it and didn't understand them, then it would seem to me you can't prevail on that argument unless you can point to a record where you examined the human being that did the verification and got them to answer yes or no whether they'd heard these items before. Well, I don't know that anybody's ever done that in a trade case, and it certainly didn't occur to us to do that. The nature of verification, obviously, one would be, in retrospect, better off if one had more documents of the sort that you're describing. But verification is a fluid process. The verifiers come in and they— then I would think you certainly would win my vote. But it strikes me that there's some merit to what I understand to be Commerce's position, which is that it's too late to provide the key that unlocks the lock after verification. If you hold the key, you've got to supply it at verification. You're telling me your client did that, but you can't prove that. And that's why Commerce has a practice of accepting information that corroborates information that is already in the record. If we limit them, if we can't come in and say, if you look at this document, Department of Commerce, which is our financial statement, and you see that number and you go over here, this is the number we use to compute our ISEs. If we can't say that, then we don't have the ability to comment on the record. We've lost—it makes the process of filing case briefs and rebuttal briefs almost useless. I'm not trying to beat a dead horse, but did you put in any affidavits from your folks who were at verification indicating that they had in substance provided what is present on 2733? I mean, this is a different question from, did you depose the Commerce official? Do you actually have any affirmative factual evidence to support your claim as you stand here today that this is identical to what was orally relayed during? No, no, Your Honor. See, so that's hard. So there's no evidence at all to substantiate your attorney argument, and you want us to overturn a Commerce fact-finding. If that had been the case, if we had not provided the map in any form, then when we said we had explained it, there would have been an objection, and there was none. There's been no assertion on the record by Commerce that we didn't explain these. Well, Commerce's objection is this is new information. Why isn't that very objection exactly the objection that you're suggesting wasn't made? The practice is one that is underlaid by the statute, 1677M sub G, which allows the parties to comment on the record and the evidence. If we cannot point to the record and say, Commerce Department, you've misinterpreted this, these numbers actually add up. What can we say in a case brief? And it's a question of drawing the line. And is there, if I could come in and provide a map at any time, we offered to do it right after the preliminary determination came out, if we can provide an explanation without changing anything. This is all verification information. It doesn't change any of the actual sales information we provided. If we can't come in and explain that to Commerce, then we have, it vitiates the whole possibility. That's from your perspective. From Commerce's perspective, Showtime is the verification. It is. That's when they call Showtime. That's for the game. The game, you know, is like a football game. It starts and then it stops at the end of verification. And if you have an explanation that connects the dots or it's the key that unlocks the lock, then you supply that at verification. Yes, we should. And in this case, it didn't work out the way we had hoped. We should have the ability to go in. There's always going to be a misunderstanding. Can I ask a question that overarches all of this? Almost all of the material that's pertinent to this discussion is marked proprietary, private. You can't reference it. So because we're in a public courtroom, I haven't asked you about the celebrated Table 2 to exhibit, what, 3, which is a chart that's got a bunch of numbers in it. Yes. Are we bound or how are we supposed to write an opinion in this case, sir? Do we have to speak generically about these things? Or are some of these confidentiality requirements ones that were operative below that are not operative here? I mean, you would think ordinarily if you were arguing that there were seven specific pieces of information that you've claimed is explanatory as opposed to new. And if Clevenger was writing an opinion, he would write down what the material is. And then he would have an analysis whether he agreed with Commerce that it was new as opposed to explanatory. And under the terms and conditions of the confidentiality banner, I can't write that opinion. I was assuming your confidentiality was really directed to the particular rebates particular customers were receiving because you don't necessarily want everyone knowing what everyone else might be getting in the way of discount. It could result in some unhappy customers. And is that generally what it's directed to such that a lot of the confidentiality may be a little overextensive? You just sort of want us to keep that information more proprietary? That's correct, Your Honor. Okay. I haven't answered your question. I'm released from the confidentiality sticker that's on page 2733. These are the specifics. It's the guts. You're asking for us to tell Commerce to go back and review your post-verification brief by including certain statements in the brief, right? That's correct, Your Honor. What's at stake? The first item under page 2 is explanation of why the dingbat was divided by the other bat, right? I'm just covering that up. Can I say that in an opinion, yes or no? Yes. How about the rest of it? I would say that the item on page 7, I mean, the page 7 item discussing the fact of the sales. Page 2, page 6, page 7. I'm sorry. Exhibit 4. Exhibit 4. Exhibit 4. Thank you, Your Honor. May it please the Court, while it might not be my place to suggest this, I would respectfully suggest that a Rule 36 affirmance would be appropriate in this case and avoid the problems of confidential information. The Court of International Trade thoroughly analyzed the issues in this case. That would brush under the rug the question of whether Commerce has the unfettered discretion under its regulation to decide whether something is new as opposed to being explanatory, wouldn't it? No. The Court of International Trade thoroughly explained what the law is citing this Court's decision. No one is asserting that Commerce has unfettered discretion, but the Court of International Trade held, after thoroughly reviewing the record and analyzing the arguments of all sides, that Commerce did not abuse its discretion. And as the Court of International Trade concluded, that the results were as accurate as possible and not punitive, because Commerce did not select the most adverse information it could use. It used the anti-financial statements. The other side is simply arguing for a simple ruling for us that tears page 2733 out of the record and sends it back to you and says, please include these items in the post-verification brief, and then reassess the situation. That's what they're asking for, right? Well, first of all, if it isn't new information, then there's no guarantee that the outcome is going to be different. Commerce did allow — Timken is perfectly willing to understand the possibility that the remand they ask for will result in a loss for them. Well, this isn't the statute. They're not arguing for us to order Commerce to accept their ISE and to accept their argument on the rebasing commission. I'm only pointing out that if the information really isn't new, if it's just an explanation of the data that is in the record, the Commerce Department did allow everything in the case brief to be included. The only information that was redacted was in attachments to Yanti's case brief. Unless I misunderstood counsel for Yanti Timken, and I perhaps would, he told me that each of the items on 2733 were orally presented, if you will, after verification. There's no information in the record that would support that. And in the Commerce Department's very detailed decision memorandum — — that each of these items had indeed been presented at verification, okay? Let's assume that that was the person at verification that testified under oath. Timken told me each of these things. Then you can hardly argue that it was new information, right? That's correct.  And to the extent that Yanti pointed out matters that were provided at verification but perhaps not clearly enough, the Commerce Department did make some appropriate adjustments. So does this whole case — does Timken lose this case because they forgot to depose the Commerce Department officials that were present at verification and asked them item by item, did Timken, yes or no, tell you this at verification, and the person in the long answer, yes, they did? No, Yanti loses this case because it admits and it said repeatedly to Commerce that it wanted to provide new information after the verification. And that's not the regulatory or statutory scheme we have. These investigations, as you know, are extremely complex. It takes an army of economists and accountants to pore over this information. This was the 17th administrative review under the taper bearing — taper roller bearing. You know, sometimes when you're reading like a financial statement, an income statement or something like that, in order for it to make sense, you have to read some other accounting document first, you know, just in order. That's correct. Same way that sometimes you sequentially have to read a statement of facts before you can decide what the application of the law would be. So what Timken is trying to say to us is all they want to do is to make certain that Commerce understands in reviewing its post-verification request that this is the order in which you have to look at our documents. Well, Timken tries to frame what it called at the time new information. It's now saying it was an explanation. But I need to supplement my response to the Court's initial questions because Timken never did submit certain sub-ledgers that were requested. Right. If you're explaining why — And that's it. And I'm going to assume that I was released. If you're going to try to explain why corporate costs were divided by global sales, right? Correct. Then why is that new factual information as opposed to saying here's why, here's the reason why we did it? Right. Well, at Joint Appendix 122, which is the final issues and decision memorandum by the Commerce Department — 122. Yes. — the Commerce verifiers explained that originally Timken only reported information for its corporate cost center. But then it verification — which would have kept its indirect selling expenses low because it was only reporting certain corporate center costs. But at verification, the Commerce Department found that there were other costs of the same nature that hadn't been reported. So in that situation where — and there were numerous other instances documented in that decision memo, which Yanti didn't even challenge at the Court of International Trade. But in that situation, the Commerce Department can't simply accept a truckload of information after it's finished its verification and under the statute has a deadline for making a decision. Just accept it blindly with no opportunity to check it and say, oh, well, thank you for the key. Now we'll give you everything you want, even though you answered six questionnaire responses. And Yanti doesn't contend that the questionnaires were unclear or that there was any confusion, which in some cases the courts have noted as a problem. But Yanti doesn't even allege that here. Yanti doesn't allege that any statute or regulation required commerce to accept its information. It says that commerce has a practice of occasionally accepting information after verification, but none of the examples it cites involved companies that failed verification. They were companies that passed verification, everything was verified, but perhaps there was a small item or two that commerce asked them to provide later, or they had some updated information that wasn't available at the time of verification. But their responses could be trusted because they had already, everything else they had provided up to then had been thoroughly verified and had checked out. None of the examples that Yanti mentions involve companies that, where their answers could not be verified at the verification and then later said, well, here's the data. Just accept it. But given that commerce only asked for ten different particular sales to be focused on, come to verification with all the information on these ten, but they were all aftermarket. So what obligation did they have to substantiate their statement in response to the questionnaire that rebates only apply to aftermarket and not OEMs? Well, the law is clear that they bear the burden of demonstrating entitlement to any kind of adjustment. The verifications are like spot audits. Sometimes no verification is conducted. Sometimes commerce only checks certain things at verifications. It's a little bit like the IRS conducting audits of income tax returns. But when commerce does conduct a verification, what it checks needs to match up with the questionnaire responses. Right. And what you checked didn't match up, and I understand. And I don't think that they're disputing the application of partial adverse facts to the aftermarket products. But none of your ten examples that you asked included OEMs. So what was it they were supposed to bring or should have brought but didn't? Because the point I guess I'm focusing on is one of the points they made in their brief, that it was possibly fair for you to apply adverse facts and therefore apply this higher percentage to all of our aftermarket sales. But why in the world are you also doing it to the original equipment sales? Because none of their ledgers or financial statements showed any distinction between aftermarket and OEM, and they never provided any direct evidence of any rebates or commissions. All they showed was one agreement, and we don't know whether they ever even used that agreement or whether they ever had any rebates or commissions or whether there was another agreement. Yantai criticizes the Court of International Trade unfairly for not addressing that distinction, but the Court of International Trade did address it at least three times in its slip opinion at pages 12, 13, and 38, and actually 38, 39. That was a two-page discussion. And the Court of International Trade addressed in some detail the general problem of no information on rebates and commissions, let alone a distinction between the two types at pages 19 and 20 and 23 and 24 of its opinion. So it's unfair and inaccurate to criticize the Court of International Trade for not addressing that issue in such a way that this Court could review it. How important, Ms. Davidson, on the ISC issue were the ratios that were used to allocate expenses between the auto bearing, industrial bearing, and the steel businesses? The Court of International Trade, at a couple of points in its opinion, pointed out that Timken had failed to identify the ratios that were used to allocate these expenses. Is that information that Commerce had asked for? Yes, because those are general expenses, and this goes back to your original question, whether Commerce asked for the information. The party seeking the adjustment bears the burden of coming forward and saying, these are the adjustments we are entitled to and here's why. So they claimed the adjustment, and Commerce said, okay, now you have to show us the money, show us the documents, the ledgers, the subledgers, the receipts, the financial statements that demonstrate that you're entitled to this. So in that sense, Commerce asked for the supporting documentation if they wanted the adjustment. Could you support their claimed adjustment without having in hand the ratios that were used to allocate in this instance? No, because Yantai produces numerous other products. Okay. Were these ratios ever provided? Not to my knowledge. They weren't? No. So they weren't even provided by way of explanation in the letter at the end? I should say not before verification. There was no basis to allocate those costs between the subject merchandise and other merchandise. Which I'm trying to get at. And were those ratios offered after verification? That's my understanding, Your Honor. Okay. And they were necessary in order to get the ratios themselves, right? Correct. I would assume that you would argue that clearly the ratios, if not other material, were new factual information that hadn't previously been presented. That's correct. And definitely not supported. And you could not substantiate their claimed adjustment without those ratios. That's correct. And therefore, Commerce took the total amount from the financials. What I'm trying to do, and not to help your case but to help my own mind out here, is to see if there is one piece of information that Timken did not supply at verification, that they tried to supply later on, that beyond peradventure of doubt is not explanation, it's factual information. Well, I think the additional — That is necessary in order to substantiate the claimed adjustment they're asking for on ISE. I want to be clear about this because I want Timken to have a chance to respond. Because if you're looking for the cleanest way to decide this case in your favor, it's just to pick out one dispositive piece of information that was not supplied at verification that was being offered later on that is beyond peradventure of doubt factual. Well, because Yantai wants the lowest costs ascribed to it, it wants low costs which will then keep its U.S. price high. Because you start with the actual U.S. price and then deduct costs. And it wants a high price to compare to its home market price. So it wasn't so much that Yantai was coming in with additional costs and saying, oh, we just found this receipt. It wanted to keep its costs low. So in that sense, it's explanations about how commerce should read its documents. But it's a ratio that's a number. It says this percentage to this group, that percentage to that group. That was a new percentage which is not supported in their documentation. They came in after verification and said, although there's this number on our financial statements. It's a number over here, and you need to take 23% of that. And when the number is in here, you take 18%. And over here, you take 14%. Right. But there's no documentation to support that claim. Right. But are you asserting to me that picking those particular percentages to apply to a grossed-up number that was in the record was required in order to substantiate the claimed adjustments that Temkin was asking for on the ISE? Yes. They would have to document that number, provide independent verification that that was an appropriate discount. So if commerce, for example, at verification itself had applied just out of the sky a different ratio, they would have been wrong. And I'm sure that the domestic industry would have certainly challenged. Only Temkin would know what the ratio was between the auto bearing, industrial bearing, and steel businesses. Only Temkin would know, but it would have to verify that fact through independent documentation to the Commerce Department. And certainly, if it didn't have documentation, it would have to generate the material that Commerce could verify in advance of the verification.  Thank you. Thank you, Your Honor. If you would tell me I'd be wrong to decide the cases, I just suggested that I could. Temkin did not supply the ratio-specific numbers needed to allocate expenses between the three divisions until after verification. Would it supply during verification? Yes or no on the ratios. The answer is you didn't give them until later. The answer is no, not as ratios. What we did supply was the actual numbers. Could you get to your ISC claimed adjustment without the ratio? Yes or no? Yes. How could you do it? Because you could take the two numbers that were used to compute the ratio, which were given to Commerce, and calculate that it was 23%. How would you know which numbers to pick? We provided those at verification. They're included in the verification exhibits. And that's part of the information that you're now trying to get into record later on, how to do it? I was trying to find whether or not that was included or not. I can't tell you. Counsel for the government has talked about us offering new information. I think that's taken out of context. We're talking on ISEs. What we wanted to do here is provide an explanation. After the preliminary determination came out, there were a lot of issues raised. We went into Commerce and said, what can we do to fix this? If we can give you new information, we made a lot of different offers. We offered to come back to the plant and do further verification. But in context of ISEs, what we offered to do was provide a written version of what had been orally presented to the Department of Commerce during verification. Plus the ratio. Sorry? Written explanations plus the actual ratio. Yes. That would have been part of it. Although one ‑‑ yes. Well, I'll be honest with you. For me, the Achilles heel in your case is on the ratios because they sure strike me as being factual in nature. And they are new and they come after the fact and they appear to be necessary in order to substantiate your claimed adjustment on the ISE. But a ratio consists of one number divided by another number. The ratio of, for example, auto sales to industrial sales, say. We provided the two numbers for auto sales and industrial sales.  One could simply ‑‑ So in your view, the ratio is just part of the key that opens the lock? Yes, sir. Council also mentioned that we did not include some expenses. We're not challenging that. We did not include them. We made the judgment that intercompany expenses and reorganization expenses shouldn't be included in ISEs. That judgment may or may not have been correct. Commerce's normal practice is to find this out and then add them in for that. We've noted in our brief that if they added in all the expenses that were allegedly missing, that would still leave us at a very low margin. The issue of whether information can be trusted or not because it's verified, the examples that we provided, that is really a red herring. We're trying to put in this information so we can show that actually we did verify. It shouldn't be the rule that you're only allowed to explain things if you pass verification because many times problems do arise during verification. And that's the point of allowing people to explain things. The issue that Your Honor raised about entitlements to any adjustment, the issue is what do you come in to explain? What do you come in to prove? In the case of an F. Lee DiCecco, the court made the decision that the petition margin rate of 40-some percent was discredited because the other evidence of record was much lower margins. That's what we feel occurred here because one could say that, well, we don't know that maybe this company, the pasta company, that had dumped by a greater margin than everybody else. But one doesn't make that, draw that conclusion. One says the record shows that by and large, margins were much lower. All other margins were much lower. We're saying here that the information of record discredits Congress's reliance on the fact that rebates and commissions were paid for aftermarket sales. Thank you, Your Honor. Thank you. The case is submitted.